# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**PEGGY J. SIEGEL,**

    **Plaintiff,**

**-vs-**                   **Case No. 6:05-cv-1637-Orl-DAB**

**COMMISSIONER OF SOCIAL SECURITY,**

    **Defendant.**

_____

## MEMORANDUM OPINION AND ORDER

This cause came on for consideration without oral argument on Plaintiff's petition for review of the denial of her application for Social Security disability benefits. For the reasons set forth herein, the administrative decision is **AFFIRMED.**

### *PROCEDURAL HISTORY*

Plaintiff protectively filed applications for a period of disability, disability insurance benefits (DIB), and Supplemental Security Income (SSI) on February 23, 2004 (R.19, 71-73, 169-71). This application was denied initially and upon reconsideration (R. 58-59, 63-64, 173-74, 178-80). On April 14, 2005, a hearing was held before an Administrative Law Judge ("the ALJ"), who rendered a decision on June 14, 2005, denying Plaintiff's claim (R. 19-27). Plaintiff filed a request for review with the Appeals Council, and the request was denied on October 22, 2005 (R. 4-8). Plaintiff has timely filed a civil action in this Court, and this case is now ripe for review.

### *NATURE OF CLAIMED DISABILITY*

Plaintiff alleges disability beginning on September 7, 2003, due to chronic pain stemming from back and neck surgeries, fibromyalgia, depression, memory lapse, irritable bowel syndrome, and sleeping problems (R. 105).

*Summary of Evidence Before the ALJ*

Plaintiff was 47 years old at the time of the ALJ's decision (R. 71), with a high school education and past relevant work experience as a retail clerk and manager and as a bar and restaurant manager (R. 111, 117).

The medical records include several records which well pre-date the alleged date of onset. The record includes progress notes from December 16, 1999 to November 14, 2000, from Frank Campsi, M.D. (R. 183-189), who treated Plaintiff for what appears to be a hernia repair (R. 186). The notes, which are vague regarding the exact procedure performed, are significant for the following excerpt, dated December 29, 1999:

> Peggy is doing well. She called me over the weekend, she required more pain medication. I called in Vicodin. She has an addictive personality. We discussed this in length, what she described as severe swelling is no longer present. I am not sure how honest she is about this. She states that last week Dr. Harold removed some fluid and she had a lot of pain after he removed but felt better before removing it. I did not find any appreciable fluid collection today to do anything with. I think we can observe her. I will see her in one week. We had a lengthy discussion about pain medication and she understands my feelings. I do not feel like more pain medication and feeding to her addiction (R. 188).

Plaintiff's treating physician Joseph Ragno, M.D., diagnosed Plaintiff with chronic musculoskeletal pain on March 30, 2000, and also expressed concern regarding the amount of pain medicine Plaintiff took (R. 329). Plaintiff reported that she "needs to take ten Soma and ten Ultram a day." *Id.* On May 31, 2000, Plaintiff returned to Dr. Ragno, and was assessed with anxiety, with

history of addictive disorders (R. 327). It was noted that Plaintiff had misinterpreted the doctor's instructions and had taken three times the amount of Ativan prescribed. On return visit June 21, 2000, Plaintiff reported passing out at work, which Dr. Ragno felt was "likely a side effect from taking too many of her medication[s]." (R. 326). Dr. Ragno assessed Plaintiff with definite neurochemical imbalances, with addictive personality and possible menopause (R. 326). He referred her for counseling and psychiatric referral and prescribed Xanax for "a total of 21 tablets with no refills, which is a lot less than the 1mg three times a day that she was asking for." *Id.* Dr. Ragno also noted that: "[A]s far as disability goes, I told her she may need to bring that up with her counselor and/or psychiatrist." *Id.*

Records from Dr. Ragno in 2001 reflect that Plaintiff complained of chronic neck and back pain, and was assessed with significant medications tolerance or addiction (R. 323, 324). Plaintiff was prescribed and was apparently taking various pain medications, such as Oxycontin (R. 325), Vicodin, Ultram (R. 324), and Soma (R. 323) throughout 2001.

Due to her chronic pain, she was referred to a pain specialist, Dr. Alexander Jungreis, on November 28, 2001 (R. 198-200). MRI studies revealed a C5-6 herniated disc, which was causing deviation on the cord, and she was referred to Dr. Masson for surgery. *Id.* On December 10, 2001, before the date of alleged onset of disability, Plaintiff underwent a decompression and cervical fusion at C5-6 and C6-7 (R. 190-91, *see also* 198). On follow-up visit with her surgeon on December 18, 2001, she reported mild posterior neck pain, and was prescribed Percocet and Soma (R. 193). On return visit on January 23, 2002, Plaintiff had multiple subjective complaints of neck pain and swallowing difficulties, although "overall, she appears to be doing well objectively." (R. 192). Her surgeon "recommended against further narcotic therapy." *Id.*

On June 10, 2002, she returned to Dr. Jungreis complaining of pain in her lower back. (R.195-97). The examination of the lumbar spine revealed diminished range of motion of the lumbar spine, particularly with extension, and point tenderness along L2 through l5 bilaterally. Sensory exam was intact, and Plaintiff had good gait and good toe-heel walk (R. 197). Dr. Jungreis assessed Plaintiff with cervical radiculopathy now resolved; lumbar spondylosis; and lumbar degenerative disc disease. Plan was to try facet blocks in her lumbar spine and physical therapy. Additionally, she was given the pain medication Percocet. *Id.*

On February 28, 2003, Plaintiff was brought by ambulance to the Emergency Room, after driving off the road at a slow rate of speed (R. 236). Doctor's notes reveal that Plaintiff had taken Soma, Methadone and Xanax (R. 237). The notes also indicate that Plaintiff denied being addicted to drugs, and "I reminded her of why/how she arrived here, of her not telling me all of her meds and giving me the wrong physician's name." (R. 237, *see also* 234). She was not found to be suicidal, and it was urged that she seek help for her addiction. *Id.* She was assessed with medication abuse and chronic neck/back pain (R. 235).

According to the record, Plaintiff did not seek additional treatment until April 21, 2003, when she presented at the office of Dr. Ragno, complaining of back and neck pain, and seeking pain medication (R. 318). Dr. Ragno noted in his objective examination that Plaintiff was lying down, but when asked to sit up, was "able to pop right up without any problem." It was noted that she seemed to move her neck fine and had no radicular symptoms or findings on exam. *Id.* Assessment was chronic neck and back pain, with possible drug seeking. Dr. Ragno prescribed Lortab and Soma, and referred Plaintiff back to her pain specialist.

On May 14, 2003, Plaintiff underwent a MRI of her cervical spine revealing the following:

-4-

a disc bulge and spondylosis indenting the thecal sac with narrowing of the left neural foramen at C3-4; an osteophyte indenting the anterior thecal sac with deformity of the anterior cord margin at C4-5; another osteophyte at the other level of the fusion, C5-6, indenting the thecal sac with deformity of the anterior cord margin and narrowing of the left neural foramen; and another osteophyte at the C6-7 level, appearing to indent the anterior thecal sac with cord deformity and narrowing of the bilateral neural foramen (R.383-384). The radiologist noted that evaluation was affected by susceptibility artifact which obscured portions of the underlying anatomy.

It appears that Plaintiff presented to the Emergency Room at the hospital on May 25, 2003, complaining of neck and back pain (R. 205-7). She was given Morphine and Valium, discharged with prescriptions for Valium and Percocet, and referred to a neurosurgeon (R. 207). Two days later, Plaintiff returned to the hospital, complaining of back pain (R. 212), and apparently seeking a refill of her prescription (R. 213). She was given medication and directed to see her own doctor (R. 214-216).

Plaintiff saw neurosurgeon Christopher Baker, M.D., on June 20, 2003, at the request of Dr. Ragno (R. 217-18). On examination, her neck was supple and nontender; motor examination was 5/5 throughout and sensory exam was intact. Gait was noted to be normal, as were reflexes and speech. It was noted that Plaintiff could repeat serial sevens and her memory was "3 out of 3 at 3 minutes." (R. 218). Review of the May 14 MRI was interpreted as showing "mild degenerative changes at C3-4 and at C6-7. It is difficult to evaluate whether there is residual compression on her cervical cord due to metallic scatter." *Id.* Dr. Baker, noting Plaintiff's "multiple somatic complaints," ordered additional studies. *Id.* It does not appear that Plaintiff underwent the recommended testing, as results are not in the record.

On July 22, 2003, Plaintiff returned to Dr. Ragno, requesting pain medicine (R. 314). Specifically, Plaintiff requested Darvocet and Soma, "at least #120 pills per month." Plaintiff reported that Dr. Baker told her that there "may be a screw or plate out of place in her neck and . . . .suggested that she go back to her previous neurosurgeon to have that . . . repaired." *Id.* On examination, she was noted to be tender in her trapezius areas and paralumbar spine area; was alert and oriented; and showed normal judgment, insight, mood and affect. Assessment was chronic pain. Dr. Ragno prescribed the 120 pills each of Darvocet and Soma, and referred Plaintiff back to her pain specialist.

Plaintiff began treating with Dr. Edwin Villalobos on August 15, 2003 (R. 344-45). During his evaluation, Dr. Villalobos noted diffuse tenderness along the cervical paraspinals, multiple trigger points with "exquisite trigger points" on the upper trapezius, infraspinatus and supraspinatus bilaterally, and trigger points at L5-S1 bilaterally, but he also noted that deep tendon reflexes were present, there was no weakness or sensory impairment and cranial nerves were intact (R. 345). Dr. Villalobos diagnosed Plaintiff with Secondary Fibromyalgia and Chronic Neck and Low Back Pain Syndrome (R. 344). Dr. Villalobos then prescribed Methadone, Norco, and Zanaflex, and suggested weaning Plaintiff from Soma. Plaintiff returned to Dr. Villalobos, on a monthly basis throughout 2003 and into 2004 (R. 342-44), and her medications were adjusted with mixed results. Plaintiff indicated that she continued to have significant pain, and wanted a prescription for Soma, which was discouraged by her doctor, as Soma is a barbiturate (R. 342).

On May 5, 2004, Plaintiff reported that she was doing better, and rode her bike and did weight lifting, without pain (R. 342). Plaintiff underwent epidural blocks and therapy on April 2, 2004, and she was advised on improving her functional levels. *Id.*

On May 9, 2004, Plaintiff was held pursuant to Florida's Baker Act after being taken to the emergency room following a presumed drug overdose (R. 238-49). She was evaluated by a psychiatrist, and she denied taking any pills and denied a past psychiatric history (R. 247). Mental status examination reveled "a cooperative lady, focus on being disagreed [sic (probably meant to be "discharged")]" (R. 248). Cognitively, she was clear and her insight and judgment were fair. She was assessed with adjustment disorder, not otherwise specified, with a GAF of 70 (R. 248-9). Her drug screen came back clean (R. 264), and she was discharged home.

On May 17, 2004, the Social Security Administration referred Plaintiff to Dr. Sam Ranganathan, internist, for a consultative physical examination (R. 281-84). Plaintiff reported that she continued to drive and cook, but did not take care of the dishes, laundry, vacuum or mop. Dr. Ranganathan noted paracervical tenderness and spasm during the physical examination, as well as mild reductions in range of motion in areas of the cervical and lumbar spine. (R. 283). He also noted equal handgrip of 5/5; well preserved gross and fine manipulations, 4/5 and equal motor system strength, and no deficits in sensory system or reflexes. Plaintiff was able to walk without assistive devices; could tandem walk and toe and heel walk, and straight leg raise test was negative in both legs. It was observed that Plaintiff could get on and off the exam table and take off her shoes and socks; sit in waiting room and walk down the hall without difficulties noted. Assessment was history of C-spine surgery; chronic pain syndrome; history of depression and history of fibromyalgia; and lumbosacral spine sprain and left shoulder surgery (R. 282). No limitations or restrictions were noted.

Plaintiff was referred to Dr. Rosimeri Clements for a psychological evaluation on May 24, 2004 (R. 285-87). Dr. Clements observed that Plaintiff drove herself to the appointment unaccompanied; was extremely well dressed; had no prominent gait abnormalities or gross motor

coordination problems; and was alert and well oriented, with no symptoms of psychosis (R. 286). On mental status exam, she had good recall or recent and remote events, speech and thought processes were logical and coherent and she had a full range of appropriate affects (R. 286-7). Dr. Clements noted that Plaintiff reported her social life as active, she watches TV and does light housekeeping. She reported difficulties sleeping, noting that she wakes up hourly (R. 287). Dr Clements assessed Plaintiff with Pain Disorder associated with both psychological and multiple medical problems, a sleep disorder due to multiple medical problems, insomnia, and noted that her GAF was presently 55 and her prognosis was guarded (R. 287).

Plaintiff continued to treat with Dr. Villalobos, returning June 7, 2004, where it was reported that she stopped using her medication (R. 342). It was also noted that Plaintiff had fallen from her bicycle (R. 342). No neurovascular changes were noted or reported. Upon resuming her medication, Plaintiff returned on July 6, 2004, reporting that she was doing well with pain levels in the 0-1 range (R. 341). In August, Plaintiff reported that she was more active in her activities of daily living and ratted her pain at best a 3, on average, a 4 (R. 341). Dr. Villalobos completed a medical assessment of ability to do work related activities on August 30, 2004, which noted that Plaintiff could carry 15-20 pounds frequently and 25 pounds occasionally; could stand or walk 1-2 hours with breaks and 30-60 minutes at a time, without breaks; could sit for 6-8 hours a day; could never climb, balance, stoop, crouch, kneel or crawl; that reaching was not affected, but handling, feeling, pushing/pulling, seeing, hearing and speaking were affected by the impairment;[1] and that Plaintiff had certain environmental restrictions (R. 338-40).

---

[1] Dr. Villalobos did not complete the section of the form which asked how the functions are affected; nor did he list the medical findings that supported the assessment (R. 339).

-8-

Plaintiff returned to Dr. Villalobos on September 30, 2004, again rating her pain levels at 3-4, and without neurovascular changes noted or reported (R. 374). Plaintiff continued to return in October, with no neurovascular changes noted or reported, and on November 22, 2004, Plaintiff returned, noting pain levels of 2-3 (R. 372). On December 21, 2004 visit, no changes were noted or reported, and Plaintiff continued at a pain level of 2. *Id.* On January 19, 2005, Plaintiff reported a pain level of 1-2, and Plaintiff reported that she was no longer on Soma, except as needed. *Id.* On her February 14, 2005 visit, Plaintiff noted a pain level of 3, which she attributed to her recent move into a two story home and her climbing stairs. Soma was again prescribed, with caution as to limiting the use (R. 373). On March 14, 2005, Plaintiff reported her pain at a level of 3, and reducing her dosage of medications was discussed (R. 375).

Dr. Villalobos completed another medical assessment regarding Plaintiff's ability to do work-related activities (Physical) (R. 379-381) and an assessment directed to mental abilities on March 24, 2005 (R. 376-378). In the physical capacities evaluation, Dr. Villalobos indicated that Plaintiff could now lift only 0-5 pounds; could stand for only one hour with breaks and not at all to 30 minutes, without interruption; sit three to four hours in an eight-hour day, and only 30 minutes without interruption; and her ability to reach (intact in the prior assessment) was now compromised (R. 379-81). In the mental evaluation form, Dr. Villalobos noted that Plaintiff had poor or no functioning in most work-related activities, such as her ability to relate to coworkers, deal with the public, use judgment, interact with supervisors, deal with work stress, function independently, understand and remember complex job instructions, demonstrate reliability, and relate predictably in social situations (R.376-77). In response to a prompt to describe any limitations and include the

medical/clinical findings that support this assessment, the doctor wrote: "Pt suffers from anxiety, fibromyalgia, neck, and low back pain (chronic)." (R. 378).

The record also includes reports from non-examining state agency consultants, which indicate, in essence, that Plaintiff could perform light work (R. 288-295; 346-53). Non-examining state agency consultants also opined as to Plaintiff's mental limitations, with one consultant concluding that Plaintiff did not have a severe mental impairment and suffered only mild limitations (R. 296-311) and one concluding that Plaintiff suffered from no more than moderate limitations (R. 354-71).

Plaintiff appeared and testified at her hearing as to her pain and limitations. No vocational expert testified.

The ALJ found that Plaintiff had the following severe impairments: degenerative disc disease, status post fusion, and an affective disorder (R. 21). The ALJ concluded that Plaintiff could perform light work which requires no more than simple, repetitive, unskilled tasks (R. 24, 26 Finding 6). The ALJ found that Plaintiff was able to perform a full range of light work, and relied on Rule 202.21 of the Medical Vocational Guidelines (the Grids) to find Plaintiff not disabled (R. 25-26).

Following the issuance of the decision, Plaintiff was again hospitalized under the Baker Act (R. 386). In treatment note dated June 20, 2005, it was noted that although Plaintiff complained of significant short term memory problems, "short term memory and recent memory is intact currently and the patient is able to recall all the things she forgets to do, all the medications she is taking and who supplies how much of each." (R. 389). This record was submitted to the Appeals Council, but was not considered by the ALJ. Plaintiff does not contend that remand is required to consider this evidence.

## *STANDARD OF REVIEW*

The scope of this Court's review is limited to determining whether the ALJ applied the correct legal standards, *McRoberts v. Bowen*, 841 F.2d 1077, 1080 (11th Cir. 1988), and whether the findings are supported by substantial evidence, *Richardson v. Perales*, 402 U.S. 389, 390 (1971). The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla – *i.e.,* the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995), *citing Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982) and *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision. *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991). The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. *Foote*, 67 F.3d at 1560; *accord, Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (court must scrutinize the entire record to determine reasonableness of factual findings).

### *ISSUES AND ANALYSIS*

Plaintiff raises four issues as error: 1) whether the ALJ erred in determining that the claimant has the residual functional capacity to perform light work when the treating physician indicated that the claimant was precluded from performing even sedentary work; 2) whether the ALJ erred in not utilizing a Vocational Expert; 3) whether the ALJ properly evaluated Plaintiff's allegations of pain;

and 4) whether the ALJ properly evaluated Plaintiff's credibility. Upon careful review of the record and the law, the Court finds no error.

### Treating Physicians

Substantial weight must be given to the opinion, diagnosis and medical evidence of a treating physician unless there is good cause to do otherwise. *See Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997); *Edwards v. Sullivan*, 937 F.2d 580, 583 (11th Cir. 1991); 20 C.F.R. § 404.1527(d). If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight. 20 C.F.R. § 404.1527(d)(2). The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory. *See Edwards*, 937 F.2d 580 (ALJ properly discounted treating physician's report where the physician was unsure of the accuracy of his findings and statements.)

Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments. *See Wheeler v. Heckler*, 784 F.2d 1073, 1075 (11th Cir. 1986); *see also Schnorr v. Bowen*, 816 F.2d 578, 582 (11th Cir. 1987). When a treating physician's opinion does not warrant *controlling* weight, the ALJ must nevertheless weigh the medical opinion based on the 1) length of the treatment relationship and the frequency of examination; 2) the nature and extent of the treatment relationship; 3) the medical evidence supporting the opinion; 4) consistency with the record as a whole; 5) specialization in the medical issues at issue; 6) other factors which tend to support or contradict the opinion. 20 C.F.R. § 404.1527(d). However, a treating physician's opinion is generally

entitled to more weight than a consulting physician's opinion. *See Wilson v. Heckler*, 734 F.2d 513, 518 (11th Cir. 1984); *see also* 20 C.F.R. § 404.1527(d)(2).

Here, Plaintiff complains that the ALJ did not properly discredit Dr. Villalobos' March 2005 opinion that Plaintiff could do less than sedentary work. The ALJ noted Dr. Villalobos' opinion that Plaintiff "is limited to lifting less than 5 pounds, and standing walking for only an hour" and found the opinion to be "so exaggerated" that it is "of little value." (R. 22). The ALJ noted that the opinion was inconsistent with Dr. Villalobos' notes, which indicate that Plaintiff reported feeling better, and was able to lift weights and ride her bike (R. 24). The ALJ also noted that Plaintiff's functioning was clearly greater than that noted by Dr. Villalobos, citing Plaintiff's ability to care for her two children, accomplish her activities of daily living, regularly attend her doctor's appointments, and perform other activities (R. 22).[2] These findings are supported by substantial evidence.

As noted by the Commissioner, there were *two* evaluations by this physician, less than seven months apart. In the earlier evaluation, Plaintiff had limitations similar to those found by the ALJ. There is no explanation by Dr. Villalobos as to why his evaluation changed so drastically in the interim, and the treatment notes, as summarized above, show no support for such further limitations. No neurovascular changes were noted or reported, Plaintiff's pain level was stable and, indeed, Plaintiff's pain level just prior to the second assessment was only at 3. Moreover, the March 2005 opinion is also inconsistent with the consultative examination and the treatment notes of Plaintiff's other doctors, which do not indicate such severe limitations. The opinion was properly discredited.

Moreover, the Court rejects Plaintiff's contention that the ALJ gave no reason or support for his determination that she could perform light work. As noted above, the initial August 2004

---

[2] In his decision, the ALJ cited to Plaintiff's self-report that she could cook, perform household chores and shop (R. 22).

-13-

assessment of Plaintiff's treating physician is consistent with such a finding.[3]  Moreover, the ALJ noted Dr. Baker's assessment that Plaintiff had normal sensory, motor and reflex functioning; and that the MRI showed mild degenerative changes; that she has no problems with gait or station, does not need an assistive device and can manipulate with her upper extremities (R. 21).  Although not discussed by the ALJ, the finding is also consistent with the nonexamining state agency consultant's opinion and the examining consultant's findings.  As such, the ALJ's findings regarding Plaintiff's residual functional capacity for light work is supported by substantial evidence.

### When Vocational Expert Is Necessary

Once the ALJ finds that a claimant cannot return to her prior work, the burden of proof shifts to the Commissioner to establish that the claimant court perform other work that exists in the national economy.  *Foote v. Chater*, 67 F.3d 1553 (11th Cir. 1995).  In determining whether the Commissioner has met this burden, the ALJ must develop a full record regarding the vocational opportunities available to a claimant.  *Allen v. Sullivan*, 880 F.2d 1200, 1201 (11th Cir. 1989).  This burden may sometimes be met through exclusive reliance on the Medical-Vocational Guidelines [the "grids"].  *Foote*, 67 F.3d at 1558.  Exclusive reliance on the "grids" is appropriate where the claimant suffers primarily from an exertional impairment, without significant non-exertional factors.  20 C.F.R. Part 404, Subpart P, Appendix 2, § 200.00(e); *Foote*, 67 F.3d at 1559; *Heckler v. Campbell*, 461 U.S. 458 (1983) (exclusive reliance on the grids is appropriate in cases involving only exertional impairments, impairments which place limits on an individual's ability to meet job strength requirements).

Exclusive reliance is not appropriate "either when a claimant is unable to perform a full range of work at a given residual functional level or when a claimant has a non-exertional impairment that

---

[3] The ALJ references that he considered the written record and objective medical evidence (R. 23).

significantly limits basic work skills." *Walker v. Bowen*, 826 F.2d 996, 1002-3 (11th Cir. 1987). In almost all of such cases, the Commissioner's burden can be met only through the use of a vocational expert. *Foote*, 67 F.3d at 1559. It is only when the claimant can clearly do unlimited types of work at a given residual functional level that it is unnecessary to call a vocational expert to establish whether the claimant can perform work which exists in the national economy. In any event, the ALJ must make a specific finding as to whether the non-exertional limitations are severe enough to preclude a wide range of employment at the given work capacity level indicated by the exertional limitations. *Foote*, 67 F.3d at 1559.

Plaintiff argues that a vocational expert was required because she suffered pain, and because the ALJ has acknowledged that she has moderate difficulties maintaining social functioning, concentration, persistence and pace (R. 22). The ALJ, however, considered these nonexertional limitations in formulating his residual functional capacity determination, and did not find them to be occupationally significant. The ALJ found that Plaintiff had non-exertional impairments of chronic pain, side-effects from medication, and an affective disorder (R. 24). He then found that these non-exertional impairments limited her to simple, repetitive, unskilled tasks (R. 24). The ALJ made a specific finding that Plaintiff could perform a significant range of light work and that the occupational base for light work was not substantially reduced by the claimant being limited to simple unskilled work (R. 24, 25). These findings are supported by substantial evidence. Because the Grid Rules include a limitation to unskilled work, and a limitation to simple, repetitive, unskilled tasks is

consistent with unskilled work, the ALJ did not err in relying on Grid Rule 202.21 to find Plaintiff not disabled.[4]

**Pain**

Pain is a non-exertional impairment. *Foote v. Chater*, 67 F.3d 1553, 1559 (11th Cir. 1995). The ALJ must consider all of a claimant's statements about his symptoms, including pain, and determine the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence. 20 C.F.R. § 404.1528. In determining whether the medical signs and laboratory findings show medical impairments which reasonably could be expected to produce the pain alleged, the ALJ must apply the Eleventh Circuit's three-part "pain standard":

> The pain standard requires (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain.

*Foote*, 67 F.3d at 1560, *quoting Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991). Pain alone can be disabling, even when its existence is unsupported by objective evidence, *Marbury v. Sullivan*, 957 F.2d 837, 839 (11th Cir. 1992), although an individual's statement as to pain is not, by itself, conclusive of disability. 42 U.S.C. § 423(d)(5)(A).

**Credibility**

Where an ALJ decides not to credit a claimant's testimony about pain, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding. *Jones v. Department of Health and Human Services*, 941 F.2d 1529, 1532 (11th Cir. 1991) (articulated

---

[4] The Court notes that this is not a case where the ALJ all but ignores the nonexertional limitations. Indeed, here the main basis for Plaintiff's disability claim is in itself a nonexertional limitation: chronic pain. It has never been the law, however, that an allegation of pain automatically requires the testimony of a vocational expert. As stated above, it is only where the nonexertional impairment significantly limits basic work skills that exclusive reliance on the Grids is precluded.

reasons must be based on substantial evidence).  A reviewing court will not disturb a clearly articulated credibility finding with substantial supporting evidence in the record.  As a matter of law, the failure to articulate the reasons for discrediting subjective pain testimony requires that the testimony be accepted as true.  *Foote*, 67 F.3d at 1561-62; *Cannon v. Bowen*, 858 F.2d 1541, 1545 (11th Cir. 1988).

Here, the ALJ discredited Plaintiff's allegation of disabling pain, finding it unsupported by the objective evidence (R. 23-4).  Specifically, the ALJ noted the lack of any objective condition or findings that would support the level of disabling pain she alleges.  This is supported by the above medical summary, including the absence of any sensory or reflex loss, motor difficulties or other objectively determined limitation.  The ALJ noted the inconsistencies between Plaintiff's allegations and the medical evidence, citing Plaintiff's self-report on her activities of daily living questionnaire, and noted Plaintiff's ability to testify and concentrate at the hearing.  The pain evaluation is adequately supported.

As for the credibility determination, Plaintiff argues that at no time did the treating physician indicate that she should not be experiencing pain or that she was exaggerating her symptoms (Plaintiff's brief at 18).  As indicated above, however, several of Plaintiff's treating physicians did just that; noting that she was drug seeking with an addictive personality (Ragno), an addict (Campsi), and untruthful with respect to the amount of medication she was taking (Campsi, Ragno, and the physician at the Emergency Room).  Dr. Ragno, her treating physician, declined to opine that she was disabled, directing her to bring that up with her psychiatrist or counselor, and also noted the inconsistency between her complaints of debilitating pain and the ability to "pop right up" from the

examination table, without any problem. There is ample evidence to support the credibility determination.

### *CONCLUSION*

The ALJ's determination is supported by substantial evidence and was made in accordance with proper legal standards. As such, it is **AFFIRMED.** The Clerk is directed to enter judgment accordingly, and close the case.

**DONE** and **ORDERED** in Orlando, Florida on January 22, 2007.

*David A. Baker*

DAVID A. BAKER
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Counsel of Record